# Exhibit 1

VIRGINIA:



IN THE CIRCUIT COURT OF THE CITY OF RICHMOND
John Marshall Courts Building

| | |
|---|---|
| **DENA R. POTTER,** | ) |
| Plaintiff, | ) |
| v. | ) CA No. CL14-4443-6 |
| **THE ASSOCIATED PRESS** | ) |
| and | ) |
| **KATHLEEN CARROLL,** | ) |
| Defendant. | ) |

### Complaint

Plaintiff Dena R. Potter ("Potter"), by counsel, files this Complaint against defendants The Associated Press ("AP") and Kathleen Carroll ("Carroll").

### Introduction

1. Carrol, acting within the course and scope of her employment with AP and acting as an agent of AP, with actual malice and/or a reckless disregard for the truth of her statements, has made false statements of material fact about Potter, imputing to Potter an unfitness to perform the duties of a news editor and an unfitness to perform the duties of her employment with AP.

2. Potter is filing this action in this Court to obtain relief from the defamatory and damaging statements of Carroll for which Carroll and AP are jointly and severally liable.

**Parties**

3. Potter is a former employee of AP who is an adult citizen of Virginia, residing in Chesterfield County, Virginia.

4. AP is a New York non-stock, not-for-profit corporation with its principal place of business in New York City, in New York State.

5. AP conducts business within the City of Richmond, Virginia.

6. Carroll is an adult citizen of New York State.

7. Carroll has been a Senior Vice President and Executive Editor of AP at all times relevant to this lawsuit; specifically, Carroll has been a Senior Vice President and Executive Editor of AP between October 9, 2013, and the present time.

8. The acts and omissions of Carroll set forth in this lawsuit were taken within the course and scope of her office and employment with AP; the AP has authorized and ratified all acts and omissions of Carroll set forth in this lawsuit.

9. AP is responsible and liable for the defamatory actions of Carroll set forth in this lawsuit under principles of *respondeat superior*.

## Facts

10. AP hired Potter in January 2005.

11. AP assigned Potter to the position of Interim News Editor for the states of Virginia and West Virginia in July 2011.

12. In March 2012, Potter was promoted to the position of News Editor for Virginia and West Virginia.

13. In March 2012, AP described Potter as "an outstanding journalist . . . [who] is organized, motivated and works well with others . . . ."

14. At all times during her employment with AP, Potter was in fact an outstanding journalist, who was organized, motivated, and someone who worked well with others within and without AP.

15. During the afternoon of October 9, 2013, beginning about 3:00 p.m., Potter was working closely with two other AP employees about a very important news event in Wheeling, West Virginia, that involved a shooting at a federal courthouse by a former police officer.

16. About 4:00 p.m. on October 9, 2013, Robert Lewis, a highly respected and long tenure AP journalist, telephoned Potter and told her that he was working on a story about gubernatorial candidate Terry McAuliffe's involvement in a federal criminal case in Rhode Island involving a death benefits scheme. An indictment had been issued in the case. Lewis had learned that McAuliffe was expressly and accurately identified in the federal court papers as an investor in the death benefits scheme (albeit, as it turned out, a passive investor).

17. Given that McAuliffe was a gubernatorial candidate with the election less than one month away, any story about McAuliffe's possible involvement in a federal criminal case about a death benefits scheme was a very important story that required attention.

18. It immediately was clear to Potter that she could not work effectively on both the courthouse shooting and the McAuliffe stories at the same time; Potter told Lewis that she would arrange for Lewis to work with an editor on the South Desk in Atlanta, instead of her.

19. The primary duties and responsibilities of the South Desk in Atlanta were (and still are): (a) to read and edit all stories from the 13 states in the South Region, including

Virginia and West Virginia; (b) handle any necessary or appropriate discussion with the author(s); (c) render final approval for the stories to go out "on the wire"; and (d) put the stories "on the wire."

20. The South Desk in Atlanta also was (and still is) available to provide support to News Editors such as Potter in working on and developing news stories.

21. On the afternoon of October 9, 2013, after she had talked with Lewis about the McAuliffe story, Potter informed the South Desk that her hands were full with the courthouse shooting story. Potter asked for help from the South Desk for someone to work with Lewis on the McAuliffe story.

22. The South Desk, by Supervisor Carol Druga, responded to Potter's request for assistance by assigning Lewis to work with Norm Gomlak ("Gomlak"), an editor in Atlanta.

23. Both Potter and Gomlak reported to Lisa Marie Pane, South Regional News Editor; Gomlak did not report to Potter.

24. Potter remained heavily involved with the courthouse shooting story through the evening, continuing until about 9:30 p.m.

25. Lewis and Gomlak worked together on the McAuliffe story.

26. About 9:00 p.m., someone from the campaign office of McAuliffe's opponent (Kenneth Cuccinelli) called Lewis and asked if Lewis had seen pages 68-69 of the indictment in the federal criminal case. On pages 68-69 of the indictment, it was stated that "T.M." had lied to federal investigators who had been investigating the death benefits scheme. Given that Lewis had confirmed that the "T.M." listed earlier in the indictment as an investor was in fact McAuliffe, and there was no indication in the indictment that the "T.M." accused of lying was a different person than the earlier named "T.M.", Lewis understood that the "T.M." who was accused of lying to investigators was in fact McAuliffe.

27. Lewis' understanding was incorrect; the "T.M." accused of lying to federal investigators was not McAuliffe.

28. About or shortly after 9:00 p.m., Lewis contacted Gomlak about the new "fact"; that is, the "fact" that McAuliffe was being accused of lying to investigators in the indictment. Lewis and Gomlak decided to make the "fact" of an accusation of lying against McAuliffe (which was their understanding) the lead of a APNewsNow story going out "on the wire."

29. Lewis sent an email to the McAuliffe campaign office at 9:14 p.m., telling them that he needed a response to this

specific accusation in the indictment about McAuliffe lying to federal investigators. The McAuliffe office did not respond until at or about 9:41 p.m., when the campaign office stated to Lewis that they would have a comment to him within 15 minutes. Lewis did not share this information from the McAuliffe campaign office with Gomlak or anybody else at AP until after the incorrect story was put "on the wire" and an investigation was being made into how the mistake was made.

30. At 9:34 p.m., having just finished speaking with a federal prosecutor about the courthouse shooting in West Virginia, and believing (incorrectly as it turned out) that she could leave the office and have dinner before continuing to work from home, Potter communicated with Lewis via instant messaging.

31. Lewis told Potter that the McAuliffe story had "blown up" and that the court documents showed that McAuliffe had lied to federal investigators. Potter agreed that the information was a "great story" and that she would read it when she got home, assuming that the story already was "on the wire." Lewis then told Potter that Gomlak had the story but had not yet put it "on the wire."

32. Potter then called Gomlak to see what was happening with the McAuliffe story.

33. About 9:40 p.m., Potter called and spoke with Gomlak. Gomlak told Potter that he was ready to put the story "on the wire." Gomlak asked Potter if she wanted a News Alert (which would give notice of an imminent "big story") to go out. In this phone conversation, Gomlak mentioned to Potter that Lewis should have caught the reference to McAuliffe lying to investigators earlier. Gomlak's mention of his belief that Lewis should have caught this critical "fact" earlier indicated to Potter that Gomlak was "on top" of the story.

34. Potter trusted that Gomlak and Lewis had the facts right, as was and would be the common, normal, and customary procedure and standard within AP.

35. Potter did not attempt any separate and distinct verification of the story that Gomlak and Lewis had prepared for placement "on the wire."

36. Contrary to the false and defamatory statements of Carroll at a later time, no policy, practice, procedure, or standard of AP suggested or required that Potter make any such attempt under these facts.

37. Carroll's later statements to the effect that Potter violated AP's standards and committed a grievous error when Potter did not conduct a separate and distinct verification of

the story that Lewis and Gomlak had prepared is a knowing lie.

38. Potter volunteered to put out the News Alert simply as a courtesy to Gomlak; Potter asked Gomlak to tell her when he was ready to put the story "on the wire," so that she could put out the News Alert at the proper time.

39. About 9:45 p.m., Gomlak told Potter that the story was ready to go "on the wire"; Potter put out the News Alert and Gomlak put "on the wire" the story that contained the allegation that McAuliffe had lied to federal investigators.

40. About 10:00 p.m., Lewis received a statement from McAuliffe's campaign office expressly denying that the "T.M." accused of lying to federal investigators on pages 68-69 of the indictment was McAuliffe.

41. At 10:05 p.m., Potter received a message from Lewis, asking Potter to "hold on" and referencing the statement Lewis had received from McAuliffe's campaign office.

42. About 10:05 p.m., Potter called Lewis and questioned what was going on; Potter told Lewis that she had understood that Lewis and Gomlak had nailed the story down.

43. Potter pulled up the indictment and read it for the first time.

44. At 10:12 p.m., Potter messaged Gomlak. Potter told

Gomlak about the statement from McAuliffe and that she was talking to Lewis and reading the indictment for herself.

45. At about 10:25 p.m., Potter began a conference telephone call with Gomlak and Lewis. Potter asked how they arrived at the conclusion that the "T.M." accused of lying was McAuliffe. Gomlak and Lewis walked Potter through their reasoning. The three decided to call Pane to discuss the situation.

46. After a first failed attempt to establish a conference call, Potter, Pane, Gomlak, and Lewis began a conference call about 10:42 p.m.

47. The four decided that the story stating that McAuliffe was accused of lying to federal investigators needed to be "killed" immediately.

48. Pane directed Gomlak to "kill" the story and work with the proper people to get it done.

49. About 11:00 p.m., Potter noted that the "kill" still had not happened. Potter called Gomlak to ask why. Gomlak told Potter that he was having problems getting the "kill" done because of problems with the publishing software. Potter talked Gomlak through the process to get the story that included the accusation of lying "killed" and a correct version of the story

(simply referencing the fact that McAuliffe was an investor in the death benefits scheme) out "on the wire."

50. About 11:23 p.m., the "kill" occurred and the corrected story was put "on the wire."

51. Lewis filed a completed correct version of the McAuliffe story about 12:15 a.m. on the morning of October 10, 2013.

52. McAuliffe's campaign office and McAuliffe himself between the time the inaccurate story moved "on the wire" and the present time were and have been very gracious about the mistake that was made and they never sought nor requested that AP or Carroll take any adverse employment action against Potter.

53. Regarding the above events, starting on or about October 10, 2013, Carroll has maliciously published to third parties false and defamatory statements to the effect that Potter had made a "grievous mistake" from which "there was no recovery." In fact, Potter made no grievous mistake from which there was no recovery.

54. Starting on or about October 10, 2013, Carroll has maliciously published to third parties false and defamatory statements to the effect that Potter had "failed the [AP's] own standards." In fact, Potter's actions as described in this

Complaint were consistent with AP's policies, practices, procedures, and standards.

55. Starting on or about October 10, 2013, Carroll has maliciously published to third parties false and defamatory statements that there were "no employees involved in something like" what Potter was involved with on October 9, 2013, "who did not leave the company." In fact, far more serious errors, such as the error with regard to AP's erroneous identification of the Newtown shooter, did not result in anyone leaving AP.

56. Starting on or about October 10, 2013, Carroll has maliciously published to third parties false and defamatory statements that the standard she applied to fire Potter "does not mark a change in our standards." In fact, the standard Carroll applied to Potter when firing her was a unique change and variance in the pre-existing, established standards of AP.

57. AP continued to describe Potter as an "excellent journalist," as stated in paragraph 13 above, until Carroll maliciously, by the defamatory statements described in paragraphs 53-56 above, caused AP, first, to suspend Potter on October 16, 2013, and then, to fire Potter on or about October 21, 2013, without prior notice or good cause.

58. Having personally caused AP to suspend and then fire

Potter by means of publishing defamatory statements about Potter, Carroll was highly motivated to make and continue to make false statements of fact, that is, defamatory statements of fact, about Potter, attempting to justify her unjustifiable decision to fire Potter.

59. On October 24, 2013, in a conference call with AP employees of the South Desk and within Virginia and West Virginia, Carroll willfully, wantonly, and maliciously made the false and defamatory statements set forth in paragraphs 53-56, knowing of the falsity of the statements or acting in reckless disregard for the truth or falsity of the statements.

60. Carroll's verbatim statements about and concerning Potter made at a Town Hall meeting of AP employees on or about November 12, 2013, include the following verbatim statements of Carroll as set forth below:

> [Carroll] . . . Let's spend just a brief minute on what won't change: our core mission to report the news. That will not change, will not ever change. Our standards for accuracy and the importance of credibility that that accuracy gives us, that won't change. As you know, that credibility is a competitive advantage for us when we're competing for business. People trust us because every day the men and women of the AP work really hard to uphold those high standards.
>
> So, let me now address a recent and extremely serious violation of those standards that led to the departure of three people from the news department. Last month, we sent out a story that falsely accused someone of a crime. There

was no source for that accusation. A 162 page court
document said only that someone with the initials T.M. had
lied to a U.S. investigator, which is a crime. We made the
assumption that T.M. was one of two candidates for governor
in Virginia, an assumption that was suggested to us by the
opponent's campaign. We did not talk to the man that we
were about to accuse, and we put that accusation out to the
world. That accusation was completely wrong, and the story
was killed. It was a very bad mistake.

Now, do we make mistakes? Well yes, despite the fact that
we all strive mightily not to, and when we do, we move
swiftly to correct them. But all mistakes are not equal.
Some are too grievous and there is no recovery from them,
and that was the case here. Mistakes as serious as this one
put our reputation for accuracy at grave risk. The men and
women of the AP, all of you and all of your colleagues
around the world, furnish that reputation for accuracy
thousands of times every day, making the right decisions
and upholding those high standards of which we are justly
proud. So thank you for hearing me out and now Gary's
coming back to wrap up.

. . .

[Question and Answer Session with Gary Pruitt, AP's
President and CEO, at Lectern]

. . .

[Beth Harpaz] . . . The firings that Kathleen referred to
have sent a chill through the editorial staff. Why
shouldn't editors and reporters be afraid to send
controversial stories to the wire, and what are these
standards? If we were covering Newtown today and we
identified Ryan Lanza as the shooter, as we did, would
heads be rolling?

[Pruitt]  I'll let Kathleen [Carroll] speak to that.

[Carroll]  Listen, there are no new standards. These are
the same standards we've always upheld. There's a
difference, I think, between a source giving us bad
information; a previously trusted good source giving us bad

information; and us doing what happened in Virginia. I
think there's a very big difference there. What we have
learned every time we have bad information from a source is
to go back and figure out what went wrong and try not to
make that mistake again and all of you have been very
involved in a lot of the after-action reports in those
cases. We try and improve. This is a very different case.
What I really hope that people learn from all of these
cases, and not just Virginia, is to use your good
instincts, to rely on your colleagues, to make sure that
when you push that button on any kind of a story,
controversial or not, that you're sure of what you're
doing. That you're confident that what we're about to
report is factually accurate. And if that means holding up,
as you know we've always said we value accuracy over speed,
if you need to wait longer, if you need to make a second
phone call, if you need to call your boss, you need to
check with somebody in the Nerve Center, just so that
you're confident. Do that. It's more important that we're
sure. But these are not new standards; these are simply
upholding the ones that have always been part of the AP.

61. The verbatim statements in the preceding paragraph set forth the same defamatory innuendo about and concerning Potter as set forth in paragraphs 53-56 above.

### Statement of Cause of Action: Defamation Per Se

62. Acting with actual and legal malice, Carroll and AP tortuously defamed Potter with false statements of material fact as set forth in this Complaint; as the result of such tortious conduct, Potter has suffered lost employment, lost income, lost benefits, damage to her earning capacity, damage to her reputation, mental anguish, and emotional distress.

63. An award of punitive damages is appropriate to punish

and deter Carroll and AP because of their malicious, willful, and wanton conduct as described in this Complaint.

### Trial by Jury

64. Trial by jury is demanded.

### Relief Requested

**WHEREFORE**, Potter asks that this Court enter Judgment in her favor against AP and Carroll, jointly and severally, awarding her the following relief:

65. Compensatory damages in the amount of $600,000;

66. Punitive damages in the amount of $350,000;

67. Her costs incurred; and

68. Such other and further relief as is proper.

Dated this 14th day of October 2014.

Respectfully Submitted,

DENA R. POTTER

By: _/s/ David R. Simonsen, Jr._
Counsel

David R. Simonsen, Jr. (VSB #20078)
Vickey A. Verwey (VSB #20267)
8003 Franklin Farms Drive, Suite 131
Richmond, Virginia 23229-5107
Tel: (804) 285-1337
Fax: (804) 285-1350
Email: DSimonsenJ@aol.com

Counsel for Plaintiff

**COVER SHEET FOR FILING CIVIL ACTIONS**  
COMMONWEALTH OF VIRGINIA

Case No. ..................................................
(CLERK'S OFFICE USE ONLY)

City of Richmond ........................................ Circuit Court

Dena R. Potter ........ v./In re: ........ The Associated Press and Kathleen Carroll
PLAINTIFF(S) — DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [x] attorney for [x] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

**GENERAL CIVIL**
Subsequent Actions
[ ] Claim Impleading Third Party Defendant
  [ ] Monetary Damages
  [ ] No Monetary Damages
[ ] Counterclaim
  [ ] Monetary Damages
  [ ] No Monetary Damages
[ ] Cross Claim
[ ] Interpleader
[ ] Reinstatement (other than divorce or driving privileges)
[ ] Removal of Case to Federal Court

Business & Contract
[ ] Attachment
[ ] Confessed Judgment
[ ] Contract Action
[ ] Contract Specific Performance
[ ] Detinue
[ ] Garnishment

Property
[ ] Annexation
[ ] Condemnation
[ ] Ejectment
[ ] Encumber/Sell Real Estate
[ ] Enforce Vendor's Lien
[ ] Escheatment
[ ] Establish Boundaries
[ ] Landlord/Tenant
  [ ] Unlawful Detainer
[ ] Mechanics Lien
[ ] Partition
[ ] Quiet Title
[ ] Termination of Mineral Rights

Tort
[ ] Asbestos Litigation
[ ] Compromise Settlement
[x] Intentional Tort
[ ] Medical Malpractice
[ ] Motor Vehicle Tort
[ ] Product Liability
[ ] Wrongful Death
[ ] Other General Tort Liability

**ADMINISTRATIVE LAW**
[ ] Appeal/Judicial Review of Decision of (select one)
  [ ] ABC Board
  [ ] Board of Zoning
  [ ] Compensation Board
  [ ] DMV License Suspension
  [ ] Employee Grievance Decision
  [ ] Employment Commission
  [ ] Local Government
  [ ] Marine Resources Commission
  [ ] School Board
  [ ] Voter Registration
  [ ] Other Administrative Appeal

**DOMESTIC/FAMILY**
[ ] Adoption
  [ ] Adoption – Foreign
[ ] Adult Protection
[ ] Annulment
  [ ] Annulment – Counterclaim/Responsive Pleading
[ ] Child Abuse and Neglect – Unfounded Complaint
[ ] Civil Contempt
[ ] Divorce (select one)
  [ ] Complaint – Contested*
  [ ] Complaint – Uncontested*
  [ ] Counterclaim/Responsive Pleading
  [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
[ ] Separate Maintenance
  [ ] Separate Maintenance Counterclaim

**WRITS**
[ ] Certiorari
[ ] Habeas Corpus
[ ] Mandamus
[ ] Prohibition
[ ] Quo Warranto

RECEIVED AND FILED
CIRCUIT COURT
OCT 14 2014
EDWARD F. JEWETT, CLERK
BY _____ D.C.

**PROBATE/WILLS AND TRUSTS**
[ ] Accounting
[ ] Aid and Guidance
[ ] Appointment (select one)
  [ ] Guardian/Conservator
  [ ] Standby Guardian/Conservator
[ ] Trust (select one)
  [ ] Impress/Declare
  [ ] Reformation
[ ] Will (select one)
  [ ] Construe
  [ ] Contested

**MISCELLANEOUS**
[ ] Appointment (select one)
  [ ] Church Trustee
  [ ] Conservator of Peace
  [ ] Marriage Celebrant
[ ] Bond Forfeiture Appeal
[ ] Declaratory Judgment
[ ] Declare Death
[ ] Driving Privileges (select one)
  [ ] Reinstatement pursuant to § 46.2-427
  [ ] Restoration – Habitual Offender or 3rd Offense
[ ] Expungement
[ ] Firearms Rights – Restoration
[ ] Forfeiture of U.S. Currency
[ ] Freedom of Information
[ ] Injunction
[ ] Interdiction
[ ] Interrogatory
[ ] Judgment Lien-Bill to Enforce
[ ] Law Enforcement/Public Official Petition
[ ] Name Change
[ ] Referendum Elections
[ ] Sever Order
[ ] Taxes (select one)
  [ ] Correct Erroneous State/Local
  [ ] Delinquent
[ ] Vehicle Confiscation
[ ] Voting Rights – Restoration
[ ] Other (please specify)

[x] Damages in the amount of $ 950,000.00 are claimed.

October 14, 2014
DATE

[ ] PLAINTIFF  [ ] DEFENDANT  [•] ATTORNEY FOR  [•] PLAINTIFF  [ ] DEFENDANT

David R. Simonsen Jr.
PRINT NAME
8003 Franklin Farms Dr. Suite 131 Richmond VA, 23229
ADDRESS/TELEPHONE NUMBER OF SIGNATOR
(804)285-1337

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 10/12

**DAVID R. SIMONSEN, JR.**
*ATTORNEY AT LAW*

8003 FRANKLIN FARMS DRIVE • SUITE 131
RICHMOND, VIRGINIA 23229-5107

PHONE: (804) 285-1337     FAX: (804) 285-1350

E-MAIL: DSIMONSENJ@AOL.COM



RECEIVED AND FILED
CIRCUIT COURT
OCT 14 2014
EDWARD F. JEWETT, CLERK
BY_____ D.C.

October 14, 2014

**By Hand Delivery**

The Hon. Edward F. Jewett
Clerk, Richmond Circuit Court
John Marshall Courts Building
400 North Ninth Street, Ste. 101
Richmond, VA  23219

**Dena R. Potter v. The Associated Press and Kathleen Carroll**

Dear Mr. Jewett:

   Enclosed for filing is Plaintiff's Complaint, with coversheet, plus two service copies. Also enclosed is a check to cover the filing fee.

   As I will be arranging for service of process, please return the summons and service copies to my office in the enclosed stamped addressed envelope.

   Also enclosed is an extra copy of the complaint that I would ask be stamped and returned to the awaiting courier.

Thank you for your assistance.  If you have any questions, please call me.

Sincerely,

David R. Simonsen, Jr.

DRS,JR: jel
Enclosures